

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-26-2001

# United States v. Yeung

Precedential or Non-Precedential:

Docket 99-2040

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"United States v. Yeung" (2001). *2001 Decisions.* Paper 32.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/32

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 26, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 99-2040 and 99-2048

UNITED STATES OF AMERICA

v.

SAU HUNG YEUNG
a/k/a
FUK CHAO HUNG

Sau Hung Yeung,
      Appellant

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
D.C. Crim. Nos. 98-cr-28-1 and 99-cr-134-1
District Judge: The Honorable Thomas N. O'Neill, Jr .

Argued: October 30, 2000

Before: SCIRICA, NYGAARD, and BARRY , Circuit Judges

(Opinion Filed: February 26, 2001)

        David L. McColgin, Esq. (Argued)
        Defender Association of Philadelphia
        Federal Court Division
        437 Chestnut Street
        Lafayette Building, Suite 800
        Philadelphia, Pennsylvania
         19106-2414

         Attorneys for Appellant

        Ronald G. Cole, Esq. (Argued)
        Assistant United States Attorney
        United States Attorney's Office
        Eastern District of Pennsylvania
        615 Chestnut Street
        Philadelphia, Pennsylvania 19106

         Attorney for Appellee

OPINION OF THE COURT

BARRY, Circuit Judge.

Sau Hung Yeung was convicted by a jury of conspiring to distribute heroin in violation of 21 U.S.C.S 846, distribution of heroin in violation of 21 U.S.C. S 841(a)(1) and (b)(1)(C), and distribution of heroin within 1000 feet of a school in violation of 21 U.S.C. S 860. Additionally, Yeung pleaded guilty to a separate indictment which char ged him with being a felon in possession of a weapon. The convictions were consolidated for purposes of sentencing and, on December 9, 1999, the District Court sentenced Yeung to concurrent terms of 97 months imprisonment. He now appeals, disputing only the amount of the her oin on which the District Court based his sentence. W e have jurisdiction pursuant to 28 U.S.C. S 1291 and 18 U.S.C. S 3742(a), and review for clear err or the District Court's factual findings as to the quantity of drugs. United States v. Paulino, 996 F.2d 1541, 1545 (3d Cir . 1993). For the reasons which follow, we will vacate the sentence and remand for proceedings in accordance with this opinion.

I. BACKGROUND

Because the government has explicitly agr eed with the Statement of Facts set forth in Yeung's brief, we will replicate that recitation in full, deleting only the "Overview," the footnotes, and the bulk of the citations to the appendix.

        The Trial Evidence

         [Daryl] Nguyen became a cooperating infor mant for
        the DEA after his own arrest for distribution of heroin

2

in 1993. He pleaded guilty to those charges pursuant to an agreement that required him to cooperate with the DEA in order to obtain a reduced sentence. Nguyen (hereinafter "the informant") was instructed by DEA agent John Foley to see if he could buy an ounce of heroin from Yeung, whom he knew as Fuk Chow Hung.

In the spring of 1994, the informant told Yeung, whom he had met half a year to a year earlier , that he was interested in buying heroin, and he asked for a sample. On May 11, 1994, Yeung called the informant and told him he had a sample. The informant met with Yeung and Zheng (whom he knew as Kwai Jai) at a gambling parlor in Philadelphia and told them he was "interested in buying an ounce." Y eung and Zheng, however, "said an ounce would not do" and that "they would sell [the informant] half a unit or a unit." Yeung said a unit would cost $70,000. No agreement was reached for any purchase, but Yeung did give the informant a very small sample of heroin wrapped in plastic, which the informant later gave to DEA agent John Foley. (The sample was so small that it was entirely used up during the DEA field test.)

The informant had occasional contact with Yeung and Zheng over the next several months, and on July 27, 1994, he received a page from Y eung. The informant returned the page and Y eung told him to come to a karaoke club at Tenth and Winter Streets to pick up another sample. The informant went to the karaoke club and met with Yeung and Zheng in a small VIP room. Again, the informant, who was under strict instructions from agent Foley to buy only one ounce, told Yeung and Zheng that he only wanted one ounce. Yeung said, "No can do," and repeated that he would "only sell half a unit or a unit." Yeung said the price for half a unit would be $40,000. Again, no agreement for the purchase of heroin was reached. Zheng gave the informant a sample (weighing 0.4 grams), and the informant left, later turning the sample over to agent Foley.

On July 29, 1994, the informant had a tape-recorded phone conversation with Yeung and Zheng in which the

3

informant said, "Hey, it's not -- it's not alright, only one orange is needed." The phrase "one orange" meant one ounce. Zheng replied, "It's not alright, but one orange will not work," which meant that Zheng would not sell him an ounce. The informant r eplied, "Hey, it's not all right with you over there. He doesn't have that much with him. He only want one orange." By this, the informant meant that his "connection doesn't want the whole unit, he only needed an ounce."

In August 1994, agent Foley gave the infor mant a "drug lord car" with hidden compartments for him to show to Yeung and Zheng in order to build credibility. On August 26, 1994, the informant (who was wearing a "body recorder") showed the car to them, claiming that it belonged to the person he was buying drugs for -- a "Hispanic guy." He said that the Hispanic guy would take two units of heroin in another few weeks. Yeung told the informant to "talk to your side clearly and make sure of it," meaning that he should talk with the Hispanic guy and "make sure he r eally wants it." Again, no agreement was reached for the purchase of heroin at any quantity or for any price.

In September 1994, in an effort to obtain the telephone numbers Yeung and Zheng wer e calling, agent Foley gave the informant a cell phone and instructed him to sell it to Zheng for $100 as a "cloned" cell phone or illegal duplicate cell phone, that would supposedly be billed to some unsuspecting person. On September 26, 1994, the informant met with Zheng and sold him the phone. During their conversation, which was taped, the informant asked if Zheng could sell him two ounces. Zheng said he could not, and the "units" could not be "broken down" into ounces.

During the next several weeks, the infor mant continued to talk with Yeung and Zheng, and again told them, as per his instructions from agent Foley, that he just wanted to buy "an ounce" of her oin. Finally, in a taped conversation on October 17, 1994, Zheng agreed to sell him one ounce.

On October 18, 1994, the informant met Zheng in Chinatown at about 1:30 p.m., and Zheng told him to

4

wait for his phone call. The informant r eceived a page later that day. He returned the page and spoke with Yeung, who told him to come and get the ounce of heroin at his restaurant at Broad and York. At 4:30 p.m., the informant drove up to the r estaurant, where he saw Yeung and Zheng outside. He gave Zheng $5000 (provided by the DEA) and Zheng put an ounce of heroin on the floor of the informant's van. The informant left and turned the her oin over to agent Foley.

The informant made no other purchases of heroin from Yeung and Zheng, and there wer e no negotiations or even discussions for any other purchases.

Appellant's Br. at 4-8.

As noted above, Yeung complains only of the amount of heroin the District Court tarred him with at sentencing. Again, the government agrees with Y eung's recitation of how that sentence came to be and, again, we r eplicate it in full:

The Sentencing

Defense counsel objected at sentencing to the base offense level in the presentence r eport ("PSR") on the ground that it was based on the one "unit" quantity of heroin, instead of the one ounce quantity actually sold. One "unit," which weighs 1-1/2 pounds, or 680 grams, is within the 400 to 700 gram range requir ed for level 28. One ounce of heroin, or 29 grams, is within the 20 to 40 gram range required for level 18. Defense counsel argued that there never was an agr eement to sell a unit to the informant, and that under Application Note 12 to U.S.S.G. S 2D1.1, the amount actually sold"more accurately reflects the scale of the of fense." (App. 320a). The court overruled defense counsel's objection, stating:

I find that the evidence shows that [ther e was] a conspiracy by the defendants to sell a unit and then later half of a unit and therefore, that the probation office has calculated the amount of drugs corr ectly.

(App. 333a).

5

Mr. Yeung's guidelines wer e thus calculated starting with a base offense level of 28. One point was added because the sale of the heroin took place within 1000 feet of a school. The total offense level was therefore 29, and in criminal history category "II," the guideline range was 97 to 121 months. The gun possession charge had a base offense level of 14, and under the Multiple Count provisions of U.S.S.G. S 3D1.4, this offense, being more than 8 levels lower than the level for the drug offense, did not have any ef fect on the total offense level.

Had Mr. Yeung's sentence been based on the one ounce quantity of heroin actually sold, his of fense level would have been 18 plus 1, or 19. Under the Multiple Count provision of U.S.S.G. S 3D1.4, the gun possession charge (being 5 levels lower than the offense level for the drug charge) would have r equired a one level increase, bringing the total combined of fense level to 20. In criminal history category II, the guideline range would have been 37 to 46 months.

Appellant's Br. at 8-10.

II. DISCUSSION

At the outset, it bears mention that this is an unusual case in that courts typically see agreements or conspiracies between prospective sellers and buyers of drugs and not, as here, an agreement only between sellers. This case is also complicated by the fact that although Yeung and Zheng would have liked to sell and presumably would have sold Nguyen one unit or one-half unit or even two units, they never negotiated for more than one ounce because Nguyen simply dug in his heels. It is, of course, crystal clear that the unusual or complicated nature of this case is only such for purposes of sentencing. Yeung was pr operly convicted of conspiring with Zheng to distribute heroin-- the amount of heroin, as long as it is a measurable amount, is irrelevant to the conspiracy charge -- and Yeung does not argue otherwise.

The question before this Court, therefor e, is exceedingly narrow: whether Application Note 12 to U.S.S.G.S 2D1.1

counsels that Yeung be sentenced to the one ounce completed transaction, the one unit (or one-half unit or two units) that he and Zheng would have liked to have sold to Nguyen, or the aggregated amount of one unit (or one-half unit or two units) plus one ounce. The District Court sentenced appellant based on one unit which, after the appropriate adjustments were made, placed Yeung in a guideline range of 97-121 months.

Section 2D1.1 establishes the base offense level for defendants who agree or conspire to sell drugs, based upon the quantity of drugs involved. Application Note 12 to S 2D1.1 sets forth the method by which the appropriate quantity of drugs is determined if the of fense involves negotiation to traffic in drugs. While the parties do not dispute the applicability of Application Note 12, they disagree on how it should be applied her e. Yeung argues that the plain meaning of Application Note 12, when applied to the facts of this case, mandates that he should have been sentenced within the 36 to 46 month range for the one ounce completed transaction. The gover nment argued at sentencing that the measure of drugs should be one unit and argues before us that the sentence of 97 months should be affirmed although it initially assumed, wrongly it now concedes, that the District Court aggregated the one unit and one ounce and continues to ar gue, again wrongly, that aggregation is appropriate although, were that the case, the sentence would be higher than the sentence which it seeks to affirm.1 Who is right and who is wrong is, as should be obvious, of great significance to Yeung in terms of the time he is r equired to serve.

Yeung is right. Prior to November 1, 1995, Application Note 12 stated: "In an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount." U.S.S.G. S 2D1.1, comment. (n.12) (1992) (formerly S 2D1.4, comment. (n.1)). Notably, this

_____

1. Parenthetically, and without more ado, we dispose of the government's aggregation argument because it is based on the premise that the one ounce distribution was merely a "prelude" to an anticipated one unit transaction. There is no evidence to support this premise.

7

prior version was silent as to the amount of drugs to be considered in a completed transaction, as we have here. For that reason alone, we note, pre-amendment completed transaction cases are not terribly instructive.

Effective November 1, 1995, Amendment 518 to the Guidelines deleted the language of then-Application Note 12 and inserted, as we put it, "a new set of instructions in its place." United States v. Marmolejos, 140 F.3d 488, 490 (3d Cir. 1998).[2] Although we found in Marmolejos that the amendment merely clarified S 2D1.1 rather than effecting a substantive change, the amendment was nonetheless significant given that "Application Note 12 now specifies that the actual weight delivered, rather than the weight under negotiation, should be used for calculating a defendant's sentence if the sale was completed." Marmolejos, 140 F.3d at 491. Moreover, it is quite clear from the language of amended Application Note 12 that when a sale is completed, the amount delivered will typically "more accurately reflect[ ] the scale of the offense" unless a "further delivery" is "scheduled" or at the very least is "agreed-upon." No further delivery was scheduled -- or agreed upon -- here.

In the Commission's words, and as relevant here, Amendment 518 "revises the Commentary to S 2D1.1 to provide that in a case involving negotiation for a quantity of a controlled substance, the negotiated quantity is used to determine the offense level unless the completed transaction establishes a different quantity . . . ." U.S. Sentencing Guidelines Manual app. C at 344 (1997). Application Note 12, as amended, itself reads, in relevant part:

    In an offense involving an agreement to sell a

_____

2. An application note must be given "controlling weight unless it is plainly erroneous or inconsistent with the regulation." United States v. Miller, 224 F.3d 247, 253, n.8 (3d Cir. 2000). Although Yeung's conduct occurred in 1994, the District Court correctly used the Guidelines Manual in effect at sentencing because the 1995 amendment to Application Note 12 did not violate the ex post facto clause of the Constitution but merely clarified section 2D1.1. See U.S.S.G. S 1B1.11(b)(1); United States v. Marmolejos, 140 F.3d 488 (3d Cir. 1998).

8

> controlled substance, the agreed-upon quantity of the controlled substance shall be used to deter mine the offense level unless the sale is completed and the amount delivered more accurately r eflects the scale of the offense. For example, a defendant agr ees to sell 500 grams of cocaine, the transaction is completed by the delivery of the controlled substance -- actually 480 grams of cocaine, and no further delivery is scheduled. In this example, the amount delivered mor e accurately reflects the scale of the offense.

Marmolejos and Application Note 12 str ongly suggest, if not require, that if a defendant is to be tarred for sentencing purposes with a larger quantity than was delivered, that quantity must have been negotiated or agreed upon prior to the delivery -- the partial delivery was, in effect, a down payment. Here, no quantity was ever "negotiated" between Yeung and/or Zheng and Nguyen beyond the agreed-upon one ounce. Moreover , phrases such as "weight under negotiation," which we used in Marmolejos, and "negotiated quantity," which the Commission used in describing the amendment, suggest, if not require, an agreement between buyer and seller, with the atypical nature of this case thus r earing its head. Certainly, if Application Note 12 were to be r estricted to buyer-seller negotiations and deliveries, and putting aside Nguyen's informant status and the fact that it is not any agreement with him that is pressed, the one ounce clearly "accurately reflects the scale of the of fense."

While there is a paucity of case law construing Application Note 12, as amended, at least one case leaves little doubt that a seller-seller agreement will do for purposes of sentencing one or both of the sellers. See United States v. Gomes, 177 F.3d 76 (1st Cir. 1999). In that case, factually similar in some respects but factually dissimilar in one critical respect, the Court, citing only pre-amendment case law and recognizing that the language of Application Note 12 "still needs refinement," upheld the District Court which found that the kilo intended to be sold and not the ounce actually delivered "mor e accurately reflects the scale of the offense." See Gomes, 177 F.3d at 85.

9

Separate and apart from the other distinctions Yeung would draw between that case and this, in Gomes , while no sale beyond the sale of a one ounce sample was made,"the evidence permitted the District Court to find that [defendant] Quadros had arranged with[co-defendant] Aguiar to make the sale of a kilo or had aided and abetted Aguiar's effort to make such a sale" i.e. a "further delivery [was] scheduled," or "agreed-upon," to use the phrases used in Application Note 12. Id. at 84. Indeed, the fact that the sale was of a "sample" was itself a harbinger of a larger transaction to follow. Here, of course, ther e is no evidence that a "further delivery" was negotiated, much less "scheduled" or "agreed-upon." Between October 18, 1994, when the one ounce distribution was made, and November 19, 1998, when Yeung was arrested, ther e is no evidence that any further delivery was even discussed by Y eung and/or Zheng and Nguyen and at no time befor e October 18, 1994 was there an agreement even between Yeung and Zheng that beyond the one ounce, a sale of an amount certain was "arranged." The very predicate for the Gomes conclusion fails.

United States v. Felix, which appears to be another seller-seller conspiracy, supports the result we r each here. See United States v. Felix, 87 F.3d 1057 (9th Cir. 1996). In Felix, the co-conspirators had agreed to pr ovide a larger amount of cocaine than was, in fact, deliver ed. The Ninth Circuit found that, under amended Application Note 12, the District Court erred by not sentencing the co-conspirators for the lesser amount of cocaine actually deliver ed rather than the amount they had agreed to provide because the sale was complete with no further delivery contemplated and, therefore, the actual delivery mor e accurately reflected the scale of the offense than the earlier pr omised larger amount.

The District Court in this case similarly err ed when it ruled that "the evidence shows . . . a conspiracy by the defendants to sell a unit and then later a half of a unit and therefore, that the probation office has calculated the amount of the drugs correctly." 333a. While, as a matter of conspiracy law, Yeung and Zheng certainly conspired to sell drugs, as a matter of sentencing law the quantity of drugs

10

found was clearly erroneous. Moreover , we note, the probation officer arrived at the base of fense level for one unit (or one-half unit) for a different r eason than the District Court, finding that "During the conversations between [Yeung] and [Nguyen] they discussed the sales" of those quantities. See Addendum to PSR. Mer e discussions, whether between buyer and seller or seller and seller, are hardly enough and, certainly, will not carry the day when they preceded the only transaction which was, in fact, negotiated and the agreement as to which was the culmination of any discussions over quantity.

One final note. Contrary to what the dissent says, we do not base our conclusion on the fact that Yeung never "negotiated" with Nguyen in what was, after all, a seller/seller conspiracy to sell more than an ounce. In any event, repeated but continually rejected offers to sell varying amounts do not negotiations make. And, of course, Yeung and Zheng, the two sellers, did not and virtually by definition could not negotiate with each other . Neither do we base our conclusion on any reading of Application Note 12 which would require that a futur e drug delivery must be "scheduled" if "scheduled" is only narr owly defined, as the dissent apparently defines it, as a futur e transaction specific as to time and place. Rather, we base our conclusion on the fact, and fact it be, that ther e was insufficient evidence to show an agreement to sell –– and certainly, there was no agreement to buy–– beyond the one ounce.

Although determining the appropriate drug quantity for sentencing purposes is not a precise exer cise, before sentencing a defendant for more than he or she actually delivered, Application Note 12 requir es, at minimum, evidence of an agreement as to the quantity to be sold in the future, even as between two sellers. Stated somewhat differently, once a delivery is made and there is insufficient evidence to show that that delivery was merely a prelude to a larger "scheduled" or "agreed-upon" deal, the amount delivered will control for sentencing purposes. Yeung was sentenced based on one of several quantities bandied about by he and Zheng even though the only evidence of an agreement of any kind was the one ounce actually sold.

11

Had there been evidence of an agreement beyond that one ounce, it would have been eminently appropriate for Yeung to receive the sentence he received. Because, however, it is only the one ounce which is supported by the evidence, it is on that amount that Yeung must be r esentenced.

We will vacate the sentence and remand for proceedings in accordance with this opinion.3

_____

3. Yeung, somewhat in passing, invokes Apprendi v. New Jersey, 120 S.Ct. 2348 (2000). Given that the sentence imposed was not beyond the statutory maximum, we do not see the applicability of Apprendi to this case.

12

NYGAARD, Circuit Judge, dissenting.

The majority has done a masterful job of trying to make sense of a guideline provision, which, in the context of these facts, is counterintuitive at best, and is penologically nonsensical at worst. As explained by the majority, Section 2D1.1 of the Sentencing Guidelines establishes the base level offense for defendants who agree or conspire to sell narcotics, based upon the quantity of drugs involved. Application Note 12 to S 2D1.1 addresses the method for determining the appropriate quantity. Specifically, it requires that the agreed-upon quantity of a controlled substance shall be used to determine the offense level unless the sale is completed and the amount delivered more accurately reflects the scale of the offense. See U.S. SENTENCING GUIDELINES MANUAL S 2D1.1, cmt. n.12 (1998).

Although not explicitly addressed by Application Note 12, I agree with the majority that a seller/seller agreement is sufficient to meet this test. We diverge, however, thereafter. According to the majority, the District Court erred by holding that a seller/seller agreement was consummated that more accurately reflected the scale of the offense. I disagree. I believe that although Yeung and Zheng only sold and delivered an ounce, they agreed to sell the unit. Further, I believe the District Court properly exercised its discretion in holding that the unit more accurately measured the scale of the offense. Because I conclude that Yeung's sentence should instead reflect the unit (680 grams) of drugs that he repeatedly offered to Nguyen, I respectfully dissent.

It is undisputed that Yeung and Zheng wanted to sell a unit of drugs to Nguyen. Accordingly, the first question is whether this unit was the amount negotiated or agreed upon. If so, we must determine whether this unit more accurately reflects the scale of the offense than the amount delivered. The majority concludes that Yeung and Zheng never agreed to sell a unit, that Nguyen never agreed to buy a unit, and that the ounce Yeung delivered, rather than the unit he wanted to sell, more accurately reflects the scale of his offense. In arriving at this conclusion, the majority holds that Application Note 12 requires a further scheduled

13

drug delivery or, at the very least, an agr eement to deliver more drugs before a sentencing court can consider a negotiated drug quantity to measure the scale of an offense. Maj. Op. at 8.

According to the majority, rejected but r epeated offers do not constitute negotiations.1 Instead, the seller and buyer must schedule a further delivery of a specified quantity of drugs. Maj. Op. at 6, 8–11. Therefore, because Nguyen resisted Yeung's attempts to sell mor e than one ounce and never scheduled any further deliveries, the majority concludes that there is insufficient evidence to show an agreement to sell the unit. In my view, this interpretation and application of Note 12 is incorrect and r eflects neither the gravity of the offense nor the culpability of the appellant.

I note first that the plain language of Application Note 12 does not require a scheduled futur e delivery in order for a quantity of drugs to be considered "negotiated or agreed upon." Nor does Application Note 12 requir e scheduled future deliveries to use a negotiated or agr eed upon quantity of drugs, instead of the amount deliver ed, to measure the offense level. In one of its examples, Application Note 12 simply notes that a lack of further deliveries is a factor to consider. It states: "a defendant agrees to sell 500 grams of cocaine, the transaction is completed by delivery of the controlled substance–actually 480 grams of cocaine, and no further delivery is scheduled. In this example, the amount delivered mor e accurately reflects the scale of the offense." U.S. SENTENCING GUIDELINES MANUAL S 2D1.1, cmt. n.12 (1998) (emphasis added).

Although this example suggests that a future scheduled delivery is germane to an offense level determination, it is not an absolute requirement nor does it control every factual scenario. The facts of the present case are distinguishable from the example and, ther efore, the lack of scheduled future delivery is neither contr olling nor even helpful.

_____

1. This approach would likely surprise labor negotiators, who often negotiate for extended periods of time and make hundreds of offers before a contract is executed.

In the Application Note's example, the defendant controlled the amount delivered. The defendant ultimately delivered a smaller amount based upon his own decision. Here, however, the amount deliver ed clearly does not reflect Yeung's and Zheng's intent because they did not control the amount delivered. Instead, the amount was contr olled by the informant and reflects his pur chasing limitations. Yeung and Zheng sold one ounce only because the informant refused to buy more. It had nothing to do with Yeung's and Zheng's intention, capability, or agreement to sell more. The record reveals that Yeung and Zheng not only repeatedly offered to sell the entire unit, but continually insisted upon doing so. Had the infor mant wanted to purchase more, Yeung and Zheng would have sold it to him.

For example, during their first meeting, Y eung and Zheng told Nguyen that they would only sell unit and half-unit quantities; therefore, "an ounce would not do." Appellant's Br. at 4-5. In short, Yeung and Zheng were insistent, ready, willing, and able to sell the unit of drugs. This conduct amounts to more than "mere discussions" as the majority contends. It constitutes an agreement between Y eung and Zheng to sell the unit of drugs, despite Nguyen's r esistance and his resulting refusal to accept a lar ger amount or schedule future purchases. Although this agreement did not involve a buyer, it is an agreement nonetheless. Accordingly, I believe that Yeung's and Zheng's attempts to sell the unit were negotiations, that their obvious desire to sell the larger amount is incontrovertible evidence of an agreement, and that the unit that they agr eed to sell more accurately reflects the scale of Yeung's offense, even in the absence of a plan for future delivery.

United States v. Gomes, 177 F.3d 76, 84 (1st Cir. 1999), supports my position. In Gomes, the Court of Appeals for the First Circuit reviewed the District Court's determination that a defendant charged with conspiracy and two counts of distribution was responsible for one kilogram of cocaine. The defendant had arranged a sale with a buyer , who was an undercover agent with the Drug Enfor cement Administration. Before the meeting, the defendant advised the seller that the potential buyer wanted a kilogram of

15

cocaine. At the meeting, however, the buyer surprised the defendant and seller by requesting a one ounce sample before buying the kilogram; he assured them that if it was good, he would contact them. No later sale was made, however. Nonetheless, the District Court found that the defendant arranged and aided and abetted a sale of a kilogram of cocaine. See Gomes, 177 F .3d at 84.

The Court of Appeals began its review of the District Court's holding with the language of Application Note 12. It noted, as I believe, that the language was not absolute. It did not require courts always to use the amount delivered. See id. at 85. Rather, it established a presumption that the agreed upon amount governed "unless" a sale occurred and the quantity sold more accurately reflected the scale of the offense. See id. Moreover , the Note's example, in which a defendant, who agrees to sell 500 grams but then delivers only 480 grams, was responsible for only 480 grams is not a "universal requirement." The example involved similar amounts and a defendant, rather than a buyer , who decided to deliver less than promised. In addition, the example did not involve a defendant who, like Y eung, "independently conspir[ed] with or aid[ed] an accomplice in the sale." Accordingly, the Court held that because the defendant conspired to sell a kilogram and yet failed only because the buyer refused to accept the full amount, the kilogram and not the ounce actually delivered"more accurately reflect[ed] the scale of the offense." Id. at 85.

The Gomes court stressed that the buyer rather than the defendant controlled the amount of drugs sold. As in the present case, the defendant and the seller would have sold a larger amount if not for the buyer's r esistance. The only "plan" for a "future delivery" in Gomes was the buyer's assurance that he would contact the seller for mor e cocaine if it was "good." In essence, the agreement in Gomes is the same as the one in this case. The defendant in Gomes agreed and arranged to make a sale of a kilogram of drugs (the larger amount) just as Yeung and Zheng agreed and attempted to arrange a sale of the unit. As such, the majority's attempt to distinguish Gomes fr om the present case is misplaced.

16

Finally, I would like to note that in my view, we should review the District Court's decision (that the quantity agreed upon rather than delivered "mor e accurately reflects the scale of the offense") for an abuse of discretion. The majority does not reach this issue because it concludes that the agreed upon amount and the amount delivered were the same. However, because I believe there was an agreement to deliver a greater quantity, I must necessarily discuss our standard of review.

Our review under an abuse of discretion standard is quite narrow. A finding of abuse is appr opriate only where the judicial action is arbitrary, fanciful, or unreasonable, or when improper standards, criteria, or pr ocedures are used." Evans v. Buchanan, 555 F.2d 373, 378-79 (3d Cir. 1977). Stated differently, discretion is abused only where "no reasonable man would take the view adopted by the trial court." Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., 540 F.2d 102, 115 (3d Cir. 1976).

With this deferential standard in mind, it can hardly be said that the District Court abused its discr etion in concluding that the unit that Yeung and Zheng agreed to sell, rather than the ounce they delivered, mor e accurately reflects Yeung's culpability and hence the scale of his offense. The record overwhelmingly supports the District Court's conclusion. As noted above, Yeung wanted and was fully prepared to sell the full unit. The fact that he only sold the ounce had nothing to do with his intentions or capability. Rather, the informant limited the amount delivered and bought. Therefore, Y eung should be held responsible for the larger amount since this is the amount he intended to sell. To hold otherwise would ignore this reality, and essentially allow an infor mant's limitations to dictate the culpability of a defendant -- an outcome that belies common sense and could not have been intended by the Sentencing Commission.

In sum, I disagree with the majority's interpr etation of Application Note 12. I believe that the District Court's sentence was a proper exercise of its discretion, and would affirm its judgment. Therefore, I respectfully dissent.

17

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

18