# United States Court of Appeals

## For the First Circuit

No. 98-1476

UNITED STATES OF AMERICA,

Appellee,

v.

STEPHEN BALSAM,

Defendant, Appellant.

No. 98-1477

UNITED STATES OF AMERICA,

Appellee,

v.

JOSEPH ZACKULAR,

Defendant, Appellant.

No. 98-1478

UNITED STATES OF AMERICA,

Appellee,

v.

TODD A. ARSENAULT,

Defendant, Appellant.

No. 98-1672

UNITED STATES OF AMERICA,

Appellee,

v.

THOMAS C. MEUSE,

Defendant, Appellant.

No. 98-1894
                    UNITED STATES OF AMERICA,

                            Appellee,

                               v.

                            JOHN MEUSE,

                      Defendant, Appellant.

                    ─────────────────

          APPEALS FROM THE UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF MASSACHUSETTS

        [Hon. Reginald C. Lindsay, U.S. District Judge]

                    ─────────────────

                            Before

                    Stahl, Circuit Judge,

                Cyr, Senior Circuit Judge,

                and Lipez, Circuit Judge.

                    ─────────────────


     Joseph S. Oteri, with whom Oteri, Weinberg & Lawson, Kimberly
Homan and Sheketoff & Homan were on brief for appellant Balsam.
     Leo T. Sorokin, with whom Elizabeth L. Prevett was on brief
for appellant John Meuse.
     Geraldine S. Hines, with whom Burnham & Hines was on brief for
appellant Zackular.
     Douglas J. Beaton for appellant Thomas Meuse.
     Kevin E. Sharkey, with whom Kenna, Johnston & Sharkey, P.A.
was on brief for appellant Arsenault.
     Jonathan L. Marcus, Attorney, United States Department of
Justice, with whom Donald K. Stern, United States Attorney, Michael
J. Pelgro, Assistant United States Attorney, and Patrick Hamilton,
Assistant United States Attorney, were on brief for appellee.

                    ─────────────────

                      February 11, 2000

                    ─────────────────

                               2

**CYR, Senior Circuit Judge**.    In these consolidated criminal appeals, Todd Arsenault, Stephen Balsam, John Meuse, Thomas Meuse and Joseph Zackular seek to set aside their respective convictions, and in certain instances the sentences imposed by the district court, in connection with a rash of armed robberies perpetrated in the Boston area during 1990.  We affirm the district court judgment in all respects.

## I

## BACKGROUND

While employed as an electrician at BayBank in Lynn, Massachusetts in 1989, Thomas Meuse stole the bank's blueprints. Later, he recruited his friend James Ferguson, a convicted armed robber, as well as several other accomplices, to rob the bank. Meuse planned to cut a hole in the roof at night, through which Ferguson could gain access.  Once inside, Ferguson was to wait until bank employees arrived for work the following morning, threaten them with a gun, then force them to open the vaults.

On January 7, 1990, Meuse and Ferguson, along with other accomplices, committed the BayBank robbery as planned and made away with approximately $125,000.  Over the next eleven months, the group robbed fourteen other banks and business establishments in the Boston area.[1]

---

[1]These were:  Somerset Savings Bank (2/90); a Stoneham jewelry store (3/90); Malden Trust Company (3/90); Warren Five Cents Savings Bank (4/90); Woburn BayBank (5/90); Lynn BayBank (5/90);

Thomas Meuse participated in almost all the robberies which took place prior to his arrest in August 1990. James Ferguson participated in all the robberies. The remaining appellants — John Meuse (Thomas Meuse's brother), Todd Arsenault, Stephen Balsam, and Joseph Zackular — joined the conspiracy later.[2]

Thomas Meuse was indicted in December 1994 on a single count of aiding and abetting an armed bank robbery. See 18 U.S.C. § 2113(a), (d); id. § 2(a). Over the next six months, four superseding indictments issued, adding various charges and codefendants.[3] Following further discovery and extensive pretrial-motion practice, the forty-eight-day trial began in March 1997.

James Ferguson, a prime government witness whose testimony spanned eight days, described the criminal activities of

---

Malden BayBank (5/90); East Boston Savings Bank (6/90); Depositors' Trust Company (7/90); Lloyd's Diamond & Gold (8/90); Gallahue's Market (9/90); Everett Cooperative Bank (9/90); Woburn BayBank (10/90); and Capital Bank & Trust (11/90).

[2]John Meuse joined in March 1990, Arsenault in May 1990, Balsam in August 1990. Zackular's involvement developed more gradually: Ferguson used proceeds from the January 1990 robbery to buy a car from a dealership owned by Zackular. Over the next several months, the two became friends. Eventually, Ferguson confided in Zackular that the money used to buy the car had been stolen. At that time, Zackular advised Ferguson how to set up a sham business to conceal the source of the stolen funds. Eventually, Zackular asked if he could participate in the last two robberies, which occurred during October and November 1990.

[3]The additional charges included: conspiracy to commit armed bank robbery, 18 U.S.C. § 371; armed bank robbery, id. § 2113; using a firearm in a crime of violence, id. § 924(c)(1); and conspiring to affect commerce by means of robbery, id. § 1951.

4

his codefendants in lurid detail.  Notwithstanding the extensive cross-examination of Ferguson by defense counsel, guilty verdicts were returned against each defendant on multiple counts.[4]

## II

## DISCUSSION

### A.    The Speedy Trial Act Claim

Thomas Meuse claims that the trial was delayed for more than seventy nonexcludable days in violation of the Speedy Trial Act (STA).  See 18 U.S.C. § 3161(c)(1).  There was no reversible error.[5]

On May 5, 1995, Thomas Meuse and the government submitted a joint motion to continue the hearing on Meuse's various pretrial motions.  The motion stipulated that the "[t]he government [was] in the process of providing defense counsel with 79 transcripts of recorded conversations as well as other discovery materials," and that "[o]nce that process is complete, the parties will be in a better position to agree on certain [discovery-related] matters and to conduct a meaningful hearing before the Court."  Through

---

[4]Thomas Meuse was sentenced to 627 months; John Meuse 336; Zackular 262; Balsam 204; Arsenault 60.  Balsam, Zackular and Arsenault were directed to pay restitution as well.

[5]Normally, we would review factual findings relating to the STA for clear error only, and legal rulings de novo.  See United States v. Santiago-Becerril, 130 F.3d 11, 15 (1st Cir. 1997).  But since the district court denied Thomas Meuse's STA motion without factual findings, we undertake plenary review.  See United States v. Barnes, 159 F.3d 4, 9-10 (1st Cir. 1998).

5

counsel, Meuse expressly agreed that the requested continuance would "serve the ends of justice and that such action outweighs the best interests of the public and the defendants in a speedy trial." Although it allowed the continuance, the district court did not simultaneously reschedule the hearing date. Ultimately, the hearing took place on January 22, 1996 — 206 days after the fourth superseding indictment had been filed.

The STA states that "interest of justice" continuances are to be excluded in computing the maximum seventy-day STA time period. See 18 U.S.C. § 3161(h)(8)(A).[6] Based on our decision in United States v. Barnes, 159 F.3d 4, 9-10 (1st Cir. 1998), Meuse contends that open-ended continuances under section 3161(h)(8)(A) should be strongly disfavored. Barnes is readily distinguishable, however. There the district court had ordered a continuance on its own motion, without defense counsel's consent and with no

---

[6]The STA states in pertinent part:

The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence:
. . . .
Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.

18 U.S.C. § 3161(h)(8)(A).

6

explanation as to how the continuance would serve the interests of justice. By contrast, Meuse consented to this continuance, and the joint motion itself explained the grounds for the delay. See id. at 13 (noting that the court need not articulate its explanation for a continuance where the reasons are apparent, i.e., "set forth in the motion papers"). Furthermore, the open-ended continuance was granted because the parties suggested no date certain for rescheduling the hearing. See United States v. Rush, 738 F.2d 497, 508 (1st Cir. 1984) ("[I]n some cases . . . a court is forced to order an (h)(8) continuance without knowing exactly how long the reasons supporting the continuance will remain valid.").

Meuse further contends that his former counsel rendered ineffective assistance by endorsing the continuance. Meuse states that he told his attorney at the outset to accept no continuance because Meuse believed that the government had not yet gathered sufficient evidence to convict. Although we normally decline to address ineffective-assistance claims on direct appeal, see United States v. Ademaj, 170 F.3d 58, 64 (1st Cir. 1999), the present record is sufficiently developed to enable us to do so.

In order to demonstrate ineffective assistance, a defendant must prove that defense counsel's decision was (1) so deficient that it did not come within the "wide range of reasonable professional assistance," and (2) actually prejudiced the defense. United States v. Ortiz, 146 F.3d 25, 27 (1st Cir. 1998) (citing

7

<u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668, 689 (1984)).

Notwithstanding the conclusory assertion that the government lacked the evidence to convict, the record discloses that on May 5, 1995 the government and the defense were engaged in exchanging voluminous discovery materials — including dozens of transcripts of incriminating tape-recorded conversations — in a highly complex criminal case potentially involving multiple defendants. Moreover, after Meuse dismissed his first attorney, replacement counsel vigorously proceeded with various pretrial and discovery motions. Based on the sheer volume of the discovery materials disclosed by the government, Meuse's attorneys would have rendered less than effective assistance had they insisted on proceeding to trial precipitously, without adequate opportunity to review the strengths and weaknesses of the government's evidence.

Furthermore, the present record does not demonstrate that the 206-day delay prejudiced the Thomas Meuse defense. For one thing, the defense relied heavily on the taped conversations to impeach Ferguson, the prime prosecution witness. See, e.g., infra Section II.H.[7] There was no STA violation.

---

[7]The attempt to attribute the entire 206-day delay to former defense counsel's consent is an exaggeration as well. On July 3, 1995, Meuse's brother, John, filed his own pretrial motions. Since Thomas and John were to be tried jointly, John's motions would have tolled Thomas's STA period for the "reasonable period of delay" required to dispose of John's motions "promptly." See 18 U.S.C. § 3161(h)(7) & (h)(1). Thomas Meuse has not attempted to demonstrate that the delay from July 1995 to January 1996 for hearing and resolving John Meuse's motions was not "reasonable."

**B.     The Sealing of the Fourth Superseding Indictment**

Thomas Meuse and Todd Arsenault contend that it was improper to seal the fourth superseding indictment filed in June 1995 since the government did not disclose the reasons for doing so, and further, that the government chose to seal the indictment in order to gather additional evidence against the defendants, not because it needed more time to arrest defendants.  Finally, they urge dismissal on the ground that only a properly sealed indictment tolls the statute of limitations and the limitations period had elapsed before the court unsealed the fourth superseding indictment in February 1996.[8]

Criminal Rule 6(e)(4) provides:

> The federal magistrate judge to whom an indictment is returned may direct that the indictment be kept secret until the defendant is in custody or has been released pending trial.  Thereupon the clerk shall seal the indictment and no person shall disclose the return of the indictment except when necessary for the issuance and execution of a warrant or summons.

Fed. R. Crim. P. 6(e)(4).   Rule 6(e) rests on the premise that criminal defendants not yet in custody may elude arrest upon learning of their indictment.  Once the court sealed the fourth superseding indictment in this case, arrest warrants were issued against Arsenault, Balsam and Zackular, who had not yet been taken

---

[8]We review <u>de novo</u> the district court ruling rejecting the motion to dismiss the indictment.  <u>See</u> <u>United States</u> v. <u>Stokes</u>, 124 F.3d 39, 42 (1st Cir. 1997).

into custody on the federal charges. Contrary to appellants'
contention, moreover, the government need not articulate its
reasons for requesting that an indictment be sealed, so long as its
request is based on a ground set forth in Rule 6(e). See, e.g.,
United States v. LaLiberte, 131 F.R.D. 20, 20-21 (D. Mass. 1990);
United States v. Maroun, 699 F. Supp. 5, 6-7 (D. Mass 1988).

Their further assertion — that the government utilized
the sealing procedure as a ruse — is meritless. Rule 6(e) does not
"forbid the sealing of an indictment for any reason other than
taking a defendant into custody . . . [but] a magistrate may grant
the government's request . . . 'for any legitimate prosecutorial
objective or where the public interest otherwise requires it.'"
United States v. Richard, 943 F.2d 115, 118 (1st Cir. 1991)
(citation omitted). In the present case, the government needed to
take steps to place cooperating defendant Ferguson in a witness
protection program during the summer of 1995. The protection of a
key prosecution witness undoubtedly qualifies as a legitimate
prosecutorial objective. See id. at 119 (citing with approval
United States v. Ramey, 791 F.2d 317, 318 (4th Cir. 1986)).

Nevertheless, appellants contend that the government
should have returned to court to inform the magistrate judge of its
new objective. Appellants cite no authority for their contention,
however, and the authority we have found is to the contrary. See
id. (finding "no authority for the implied proposition that the

11

government must return to the magistrate as each new reason for continuing the sealing order arises"). Finally, appellants point to no evidence that the ensuing seven-month delay was either pretextual or unreasonable.[9]

We therefore affirm the refusal to dismiss the indictment.

## C.   **The Courtroom Seating Arrangements**

Citing the small courtroom and the attendant security concerns, the district court directed that the defendants be seated in the front row of the spectator section, rather than beside their respective counsel at the defense table. John Meuse claims that the mandated seating arrangement prevented or restrained defendants from exercising their Sixth Amendment right to communicate with counsel at trial. Further, he argues that these arrangements improperly undercut the presumption of innocence, as the jury may have inferred from the isolated grouping of the defendants that they must be conconspirators, as charged, and because the court security officers rose to their feet each time defendants got up to consult with counsel, thus perhaps intimating to the jury that defendants posed a security risk. Finally, Meuse faults the

---

[9]Although we need not opine on the matter at this time, we note that the government's decision to seal an indictment in order to gather further evidence against a defendant has been held to constitute a legitimate prosecutorial objective under Rule 6(e). See Richard, 943 F.2d at 119 (citing United States v. Lakin, 875 F.2d 168, 170 (8th Cir. 1989)).

12

district court for failing even to consider the alternative seating arrangement proposed by the defendants, which would have moved the defense counsel table forward two or three feet, thereby enabling the defendants to be seated in a row directly behind their respective counsel.

As courtroom seating arrangements "depend[] upon such a variety of factors, e.g., the size of the courtroom, the number of spectators, the number of defendants and lawyers, acoustics, security provisions, etc.," we will not disturb the trial court decision for anything less than "a clearcut abuse of discretion." United States v. Turkette, 656 F.2d 5, 10 (1st Cir. 1981); cf. United States v. DeLuca, 137 F.3d 24, 34 (1st Cir. 1998) (noting that, in light of courtroom security concerns, appellate court normally defers to reasonable conditions for admitting trial spectators). Appellants have not met their burden.

First, the district court ruled that its seating arrangement was necessary due to the limited space available in the small courtroom, and by the obvious security concerns which might arise if ten people were to be seated at or behind the defense table. Under the district court plan, moreover, the five defendants were seated only four to five feet from the defense table, in the front row of the spectator section. The trial judge also assured the defendants that they could consult freely with their attorneys as they wished, either by walking the short

13

distance to the defense table, or passing written notes. See United States v. Sorrentino, 726 F.2d 876, 887 (1st Cir. 1984) (finding that arrangement caused no hindrance in communications). Thus, in practical terms the seating arrangement imposed no significant impediment upon defendants' Sixth Amendment right to consult with trial counsel.

Nor is it apparent that defendants sustained any other significant or unwarranted prejudice. The front row in the spectator section is not an inherently prejudicial location for seating criminal defendants. See Turkette, 656 F.2d at 10. Furthermore, it is by no means clear that seating the defendants as a group directly behind the defense table, as they proposed, would have lessened any slim chance that the jury would draw an improper inference of guilt by association. Moreover, their proposal presented logistical problems, as it required that ten persons be seated in a cramped area, which would block one of the gates in the bar rail and require that all witnesses be rerouted through the remaining gate.

Finally, their characterization of the court security officers' movements — as "defensive" — is subjective and conclusory. The record in no way suggests that the security officers' actions were either so dramatic or unusual as to influence the jury unduly.

We therefore discern no clearcut abuse of discretion in

14

the district court ruling.  See id. at 10.[10]

## D.   **The Sufficiency of the Evidence**

Thomas Meuse claims that the government adduced insufficient evidence that he knew Ferguson would use a gun during their armed robbery of the Somerset Savings Bank on February 10, 1990, and that this court must therefore reverse his conviction for aiding and abetting Ferguson in the use of a firearm during that robbery.  See 18 U.S.C. § 924(c)(1).  More particularly, Meuse argues that although he and Ferguson did discuss the need to use a firearm for the Lynn BayBank robbery in January 1990, they did not do so in regard to the Somerset Savings Bank robbery, in which a significantly different modus operandi was employed.

In order to convict Meuse of aiding and abetting, it was necessary for the government to prove that he knew to a "practical certainty," United States v. Spinney, 65 F.3d 231, 238 (1st Cir. 1995), that Ferguson would use a gun in the Somerset Savings Bank robbery.  The government did so.[11]

First, Meuse exaggerates the dissimilarities in the modi

---

[10]There is no conclusive evidence that the district court declined to consider the alternative seating arrangement. Moreover, the defense motion was filed before the district court ruled.  Finally, defendants never suggested below that the court had overlooked their motion.

[11]Viewing the evidence in the light most favorable to the verdict, we assess its sufficiency de novo to determine whether a rational jury could find each element of the charged offense beyond a reasonable doubt.  See United States v. Guerrero, 114 F.3d 332, 339 (1st Cir. 1997).

15

_operandi_ employed in the two robberies. He planned and instigated these robberies because he had worked inside both banks, as an electrician, and was familiar with their layouts and security systems. In discussions with Ferguson prior to the first robbery, Meuse proposed to bypass the security systems by cutting through the bank's roof. He suggested that Ferguson be lowered into the bank to await the early arrival of bank employees, whom Ferguson was to threaten with a weapon in order to gain access to the vaults. Afterward, Ferguson was to flee in a getaway car manned by Meuse and their accomplices. The same essential elements were utilized in the first two robberies, as well as in several later robberies. Although Ferguson did not testify that he and Meuse _again_ _spoke_ about using a gun immediately prior to the second robbery, the very absence of any such discussion on the second occasion fairly invited a rational jury inference that the second bank robbery was to be conducted in essentially the same manner, including the intimidation of bank employees with a gun, successfully employed in the first robbery.

There was other evidence as well from which the jury rationally could find that Meuse himself carried the gun to the second bank robbery. Ferguson testified that, following the first robbery, he gave Meuse the gym bag which contained not only Ferguson's 9mm semiautomatic pistol but also the tools Meuse had used to cut a hole in the Lynn BayBank roof. Meuse took the bag

16

home with him; then, as Ferguson testified, Meuse carried it to the second robbery. Thus, the jury rationally could infer that upon opening the gym bag to retrieve the cutting tools needed to penetrate the Somerset Bank roof, Meuse would have seen the gun. Moreover, Ferguson testified that he used the same weapon in both robberies.

Therefore, viewed in the light most favorable to the verdict, see Guerrero, 114 F.3d at 339, the evidence supported a rational inference that Meuse knew to a "practical certainty" that Ferguson would use a gun in the second robbery.

## E. __The Guilty Plea Colloquy__

Thomas Meuse next contends that the district court erred in admitting into evidence the state-court plea colloquy which took place at the time he pled guilty to charges arising out of his abortive August 1990 robbery of Lloyd's Diamond & Gold. Citing Old Chief v. United States, 519 U.S. 172 (1997), Meuse contends that his agreement to stipulate to this earlier guilty plea barred the government from adducing any further evidence about either the prior conviction or the underlying robbery.

Evidentiary rulings under Federal Rule of Evidence 403 are reviewed only for abuse of discretion. See United States v. Tse, 135 F.3d 200, 208 (1st Cir. 1998). In his state-court plea colloquy, Meuse admitted that he and Sean Cote had used burglary tools in an attempt to cut through the Lloyd's Jewelry Store roof,

17

and when detected by police, had fired on the police while attempting unsuccessfully to escape in a stolen car. Meuse pled guilty to attempted breaking and entering, assault with a dangerous weapon, and unlawful possession of an electric weapon (stun gun), burglary tools, and a stolen vehicle. As this abortive robbery was also the subject matter of the Hobbs Act conspiracy count charged in the federal indictment against Meuse, the plea colloquy clearly was admissible as an admission probative of his guilt on the Hobbs Act count. See United States v. De Leon Ruiz, 47 F.3d 452, 455 (1st Cir. 1995); Fed. R. Evid. 801(d)(2). Thus, reliance on Old Chief was misplaced, since the government in that case had charged the defendant with possession of a firearm by a convicted felon. See 18 U.S.C. § 922(g)(1). The Supreme Court therefore held that the government must accept the defendant's offer to stipulate to the fact of the prior conviction, but could not adduce evidentiary details of the underlying crime. See Old Chief, 519 U.S. at 177, 190 ("[T]he fact of the qualifying [prior felony] conviction is alone what matters under [18 U.S.C. § 922(g)(1)]."). However, the bases for the Supreme Court ruling were (i) that "proof of the defendant's [felon] status goes to an element entirely outside the natural sequence of what the defendant is charged with thinking and doing to commit the current offense [viz., possessing the firearm]," id. at 191, and (ii) that the defendant's proffered stipulation was fully adequate to prove his felon status, whereas

18

a jury informed that defendant previously committed a serious assault might infer that he had a "bad character," and this evidence of propensity would cause defendant "unfair prejudice" under Federal Rule of Evidence 403, id. at 180-86.

In contrast, however, "the prosecutor's choice [not to accept a defendant's stipulation] will generally survive a Rule 403 analysis when a defendant seeks to force the substitution of an admission for evidence creating a coherent narrative of his thoughts and actions in perpetrating the offense for which he is being tried." Id. at 192. The Meuse plea colloquy plainly fit the latter mold, for in it he described conduct specifically charged in the federal indictment; i.e., his August 1990 armed robbery. We discern no abuse of discretion.

## F. The Rule 404(b) Objections

Joseph Zackular and John Meuse challenge various evidentiary rulings pursuant to Federal Rules of Evidence 403 and 404(b).[12] These rulings are reviewed for abuse of discretion only. See United States v. Manqual-Corchado, 139 F.3d 34, 43 n.22 (1st Cir. 1998).

Prior to trial, Zackular submitted a motion in limine announcing his intention to cross-examine Ferguson to expose his

---

[12]Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Fed. R. Evid. 404(b).

20

personal bias against Zackular; specifically, that following his arrest Ferguson had attempted to have Zackular murdered. Citing Federal Rule of Evidence 403, Zackular contended that the government should not be allowed to introduce evidence as to the basis for Ferguson's animus; i.e., that Ferguson mistakenly believed that Zackular, who had been under indictment for unrelated federal extortion charges in 1990, had implicated Ferguson in the robberies which took place in 1990 in order to obtain favorable treatment from the government in Zackular's extortion case. In November 1990, Zackular pled guilty to conspiring to transmit threats in interstate commerce. Ferguson was arrested in December 1990.

Although the district court did not permit the government to establish that Zackular had been convicted of extortion, the government was allowed to introduce evidence that a criminal case was pending against Zackular in 1990. The district court determined that the probative value of this limited proof — i.e., providing the jury with the "complete story" relating to Ferguson's alleged bias — substantially outweighed any danger of unfair prejudice.

Contrary to Zackular's claim, no per se rule bars the government's introduction of evidence clearly relevant to a jury's

21

assessment of a government witness's bias.[13]  Absent any explanation for Ferguson's animus toward Zackular, the jury might be misled to conclude that Ferguson's feelings were irrational or arbitrary. See, e.g., United States v. Robinson, 530 F.2d 1076, 1079 (D.C. Cir. 1976) ("[T]he trier [of fact] must be sufficiently informed of the underlying relationships, circumstances and influences operating on a witness so that, in light of his experience, he can determine whether a mutation in testimony could reasonably be expected as a probable human reaction.") (citation omitted).  Since the district court substantially dampened the prejudicial effect of the evidence by not allowing the government to demonstrate that Zackular had been convicted of extortion, we cannot conclude that it abused its discretion in drawing the Rule 403 balance as it did. See United States v. Aguilar-Aranceta, 58 F.3d 796, 800 (1st Cir. 1995) (noting that appellate courts rarely disturb a "debatable" Rule 403 determination).[14]

---

[13]The government points out as well that this evidence was relevant for purposes other than witness bias. For example, the evidence corroborated the Ferguson testimony that Zackular had asked to become directly involved in the final robberies in 1990 in order to get money to pay for his defense in the extortion case. We may affirm the district court on any ground apparent from the record.  See United States v. Awon, 135 F.3d 96, 99 (1st Cir. 1998).

[14]For the same reasons, we find no abuse of discretion in admitting the evidence that Zackular was required, as a condition of his pretrial release on the extortion charges, to call his pretrial services officer twice a week.  This evidence corroborated Ferguson's testimony that Zackular had placed such calls from a cellular phone, on the mornings of both the Woburn BayBank (10/90)

Second, the court did not abuse its discretion by admitting the testimony of Jeannette Dion that Dion feared her former boyfriend, John Meuse.  First, the court did not permit Dion to describe specific "bad acts" which might explain the grounds for her fear.  Further, the Dion testimony was relevant, as it explained her reluctance to testify as a government witness.  Any countervailing prejudicial effect was slight, as Dion testified that she had been fearful of Meuse on but one occasion, and was "not afraid of him otherwise."  Any error was harmless as well, given the direct evidence of Meuse's guilt (e.g., the Ferguson testimony).  See, e.g., United States v. Harris, 165 F.3d 1062, 1066 (6th Cir. 1999).

Finally, asked what Meuse had done with the robbery proceeds, Dion testified that he had bought marijuana.  As Meuse preserved no objection to this evidence,[15] we review for plain error only.  See United States v. Conley, 186 F.3d 7, 21 n.15 (1st Cir. 1999) ("Plain errors are 'those errors so shocking that they seriously affect the fundamental fairness and basic integrity of the proceedings conducted below.'") (citation omitted).  Meuse

and Capital Bank & Trust (11/90) robberies.

[15]First, the government asked Dion if she could recall whether Meuse had bought any "illegal substances."  The defense did not object.  When she answered "Yes," the government asked:  "What do you recall?"  At that point, Dion answered:  "marijuana."  Only then did the defense object.  The court sustained the objection, but the defense did not request a limiting instruction.

23

incorrectly asserts that this drug evidence was totally unrelated to the crimes charged (<u>i.e.</u>, armed robbery). <u>Cf.</u>, <u>e.g.</u>, <u>United States</u> v. <u>Currier</u>, 821 F.2d 52, 56 & n.7 (1st Cir. 1987) (drug sale unrelated to firearms charge). It was relevant at least insofar as it demonstrated that Meuse had bought many expensive gifts for Dion while he had no source of legitimate income, which made it somewhat more likely that he had used robbery proceeds to do so. As this isolated, brief reference to marijuana almost certainly had no significant prejudicial effect on the jury, we find no plain error.

## G.    **The Juror Misconduct Claim**

Appellants fault the district court for failing to "voir dire" the jury after counsel to John Meuse reported having observed jurors examining one another's notes. Appellants insist that the trial judge was duty-bound to investigate these allegations. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Ortiz-Arrigoitia</u>, 996 F.2d 436, 442 (1st Cir. 1993).

As the district courts are better situated to determine whether juror misconduct occurred and prejudice resulted, we normally review their remediation measures only for a patent abuse of discretion. <u>See</u> <u>United States</u> v. <u>Cruz</u>, 156 F.3d 22, 28 (1st Cir. 1998). "The trial judge is not . . . shackled to a rigid and unyielding set [of] rules and procedures that compel any particular form or scope of inquiry," <u>Ortiz-Arrigoitia</u>, 996 F.2d at 443, but should be left free to fashion a remedy appropriate and reasonable

24

in the circumstances, see id.

As counsel for John Meuse was the one person in the courtroom who reportedly observed the alleged misconduct, the district court simply instructed the jurors that they were not to look at each other's notes. Since appellants failed to move for a mistrial, the remediation measures selected by the district court are reviewed only for plain error. See id. at 442. And since the misconduct in question was uncorroborated,[16] and did not raise the same specter of prejudice as improper outside influences upon the jury, cf. id. at 443 (voir dire conducted where juror allegedly discussed case with daughter, who was seen speaking with defendant's girlfriend); cf. also United States v. Bertoli, 40 F.3d 1384, 1394 (3d Cir. 1994), we find no plain error.

## H.  Limitations on Cross-examination

Zackular claims that the district court erred in denying him an unrestricted opportunity to play the tape recordings of Ferguson's jailhouse conversations in an effort to show that Ferguson was biased and lacked credibility. See Fed. R. Evid. 608(b).[17]  The proffered tape recordings graphically described

---

[16]Several days later, defense counsel claimed to have seen jurors consulting each other's notes again. The district court expressly observed, however, that it had been keeping a careful watch, but had seen no impropriety.

[17]Rule 608(b) provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or

Ferguson's efforts to have Zackular killed.  Since the defense theory turned principally upon Ferguson's personal animus toward, and motives for falsely implicating, Zackular, it is Zackular's contention that the district court ruling violated his Sixth Amendment right to confront the witnesses against him.

Confrontation clause challenges are reviewed <u>de</u> <u>novo</u> to determine whether defense counsel was afforded a reasonable opportunity to impeach adverse witnesses; once that threshold is reached, the trial court's restrictions on the extent and manner of cross-examination are reviewed only for abuse of discretion.  <u>See</u> <u>United States</u> v. <u>Gomes</u>, 177 F.3d 76, 80 (1st Cir. 1999).  The Zackular claims fail.

First, during the cross-examination of Ferguson, Zackular's counsel elicited an admission that Ferguson had tried to have Zackular killed.  Moreover, Zackular played two taped conversations in which Ferguson described his antagonism; for

---

supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Fed. R. Evid. 608(b).

26

example, Ferguson threatened to "blow [Zackular's] head off."  As the jury was adequately apprised of the nature and vehemence of Ferguson's feelings toward Zackular, Zackular was afforded an adequate opportunity to impeach the witness in conformance with the Sixth Amendment right of confrontation.

Furthermore, the district court expressly ruled that Zackular would be permitted to play any tape recording which disclosed Ferguson's bias. See id. at 81 ("[E]xtrinsic evidence is admissible to show [witness] bias."). Inexplicably, however, Zackular has identified no particular tape excerpt which he was precluded from using. See United States v. Bongiorno, 106 F.3d 1027, 1034 (1st Cir. 1997) (noting that appellate court will deem waived "issues raised on appeal in a perfunctory manner"). Finally, the district court correctly held that the recordings could not be used to undermine Ferguson's credibility. See Gomes, 177 F.3d at 81 ("Extrinsic evidence of specific bad acts is not admissible to show untruthfulness.").[18] There was no abuse of discretion.

## I. Closing Arguments

Appellants contend that their convictions must be set aside due to improper closing arguments by the prosecution. First, they assert that the prosecutor intimated that defendants had the burden of proof and that they should have taken the stand. For

---

[18]Zackular argues that the contents of the tapes did not constitute "extrinsic evidence," since the recorded statements — albeit out-of-court — were made by Ferguson. On the contrary, extrinsic evidence includes any evidence other than trial testimony. See United States v. Mateos-Sanchez, 864 F.2d 232, 237 (1st Cir. 1988) ("Rule 608(b), which allows specific instances of conduct to be 'inquired into' on cross-examination to attack credibility, does not provide for the admission of physical evidence.") (emphasis added). The tapes were just such nontestimonial evidence.

instance, the prosecutor stated: "Did you hear any effort made [by the defense] . . . to ask [Ferguson] about whether he had ever made any inconsistent statements [e.g., in his taped conversations] about [appellants' involvement in] these robberies?"

Closing arguments are reviewed de novo and reversible error will be found only if the arguments were "'both inappropriate and harmful.'" United States v. Laboy-Delgado, 84 F.3d 22, 29 (1st Cir. 1996) (citation omitted). Prosecutorial comments will be found harmful if, "in the totality of the circumstances, they would probably have affected the outcome of the trial." Id.[19]

The prosecution may not comment on a defendant's failure to take the witness stand in his own defense. See Griffin v. California, 380 U.S. 609, 615 (1965) (Harlan, J., concurring). Nevertheless, the government "may focus on the absence of impeachment [of government witnesses] during cross-examination so long as [its] comments are 'sufficiently circumscribed and [do] not necessarily implicate appellant's assertion of his fifth amendment right' not to take the stand in his own defense." United States v. Goldman, 563 F.2d 501, 505 (1st Cir. 1977) (citation omitted; final alteration in original); see Hall v. United States, 46 F.3d 855,

---

[19]Among the relevant factors to be considered are "the severity of the purported misconduct, the weight of the evidence supporting the verdict, the presence and likely effect of a curative instruction, and the prosecutor's purpose in making the statement (i.e.: whether the statement was willful or inadvertent)." Laboy-Delgado, 84 F.3d at 29.

858 (8th Cir. 1995); cf. United States v. Lewis, 40 F.3d 1325, 1338 (1st Cir. 1994) (observing that prosecution comments concerning the plausibility of a defense theory do not shift the burden of proof to the defense).  Although it is a source of continual amazement to us that prosecutors would choose "to hand [a] defendant an issue on which to appeal," see Goldman, 563 F.2d at 505, these closing arguments — viewed in their totality and context — expressly focused only on defects in the cross-examination of Ferguson by the defense, without inevitably implying that appellants should have taken the stand.[20]

Second, appellants complain that the government vouched for Ferguson's credibility.  After observing that Ferguson would lose the benefits of his plea bargain were he to perjure himself, the prosecutor stated: "[Ferguson would] just throw that away, knowing that he would have two federal prosecutors, agents, going out checking everything he is saying, verifying. . . . You have seen a mountain of records . . . all of this stuff is being checked and verified, the things that he is saying. . . . Judge Lindsay, who has heard all of this [viz., the government's case] for the last three months and particularly James Ferguson for three weeks, will make that decision as to what sentence to give him."

---

[20]Moreover, even if the comments were determined inappropriate, the district court repeatedly instructed the jury that the government, not the defendants, bore the burden of proof.  See id.; supra note 19.

30

(Emphasis added.) Appellants argue that these comments suggested to the jury that the prosecutor or the judge knew of evidence, never disclosed to the jury, which would confirm that Ferguson was telling the truth.

As appellants failed to object to the closing remarks, we review only for plain error. See United States v. Smith, 101 F.3d 202, 213 (1st Cir. 1996); United States v. Wihbey, 75 F.3d 761, 769 (1st Cir. 1996) (noting that a "plain error" is one which "seriously affects the fairness, integrity, or public reputation of the trial process").

"'[A] prosecutor may not place the prestige of the government behind a witness by making personal assurances about the witness'[s] credibility;' nor may the prosecutor indicate that facts outside the jury's cognizance support the testimony of the government's witnesses." United States v. Bey, 188 F.3d 1, 7 (1st Cir. 1999) (citation omitted; alterations in original); see United States v. Josleyn, 99 F.3d 1182, 1197 (1st Cir. 1996). These prohibitions encompass assurances that the government "can monitor and accurately verify the truthfulness of the witness' testimony." United States v. Bowie, 892 F.2d 1494, 1498 (10th Cir. 1990).

Although these particular comments were inexpert and ill-advised, their context belies appellants' efforts to convert them into plain error. The prosecutor did not imply — at least not clearly and unequivocally — that the so-called "verification[s]" of

31

Ferguson's story had not been introduced in evidence at trial. Rather, by stating that "[y]ou have seen a mountain of records," the prosecutor implied that this corroboration consisted only of documents already introduced at trial. See United States v. Dockray, 943 F.2d 152, 156 (1st Cir. 1991) (government is entitled to rebut defense suggestion that government witness's plea agreement gave him a motive to lie). Further, the district court instructed the jury that it was the sole arbiter of the credibility of the government witnesses and all other evidence. Therefore, we find no plain error.

## J.  **The Hobbs Act Instruction**

John Meuse contends that the district court erroneously instructed the jury on the Hobbs Act count. Although the government must prove that the establishments which appellants allegedly robbed had operated in interstate commerce, the district court instructed as a matter of law that the businesses at issue in this case were engaged in interstate commerce.

As Meuse failed to object to the instruction below, we review for plain error. See United States v. Owens, 167 F.3d 739, 755 (1st Cir. 1999). The government acknowledges that the instruction was erroneous. See United States v. Gaudin, 515 U.S. 506, 522-23 (1995) ("[A] criminal defendant [has] the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged."). Meuse argues

32

that this was not only "trial error" but "structural error," which is not subject to harmless-error review. See Arizona v. Fulminante, 499 U.S. 279, 280 (1991). The law is otherwise, however. See Neder v. United States, 527 U.S. 1, 119 S. Ct. 1827, 1836-37 (1999). As Meuse does not dispute that the government introduced overwhelming evidence that the businesses at issue sold goods which moved in interstate commerce, and it appears beyond a reasonable doubt that the jury would have found for the government on this element, the error was harmless; a fortiori, it cannot have been plain error. See Owens, 167 F.3d at 754 (finding no plain error where "overwhelming" evidence proved omitted element).

## K.  Sentence Enhancement for Obstuction of Justice

John Meuse claims that the district court erred in imposing a two-level enhancement for obstruction of justice. See U.S.S.G. § 3C1.1. During Ferguson's cross-examination, Meuse blurted out in open court: "I want to fire [my] lawyer because I believe she's working with the prosecution." Thereafter, in various colloquies with the court, Meuse requested a severance, claimed that he had told his attorney earlier in the day that he intended to fire her, and maintained that he had been forced to blurt out the above information in open court once he realized that she did not intend to convey his wishes to the court.

A district court finding that a defendant obstructed justice is reviewed only for clear error, see United States v.

33

<u>Cardales</u>, 168 F.3d 548, 558 (1st Cir. 1999), and where the record supports at least two permissible inferences, the factfinder's choice between them cannot be clearly erroneous. <u>See</u> <u>United States</u> v. <u>Veilleux</u>, 949 F.2d 522, 525 (1st Cir. 1991).

The record contained ample support for a preponderance-of-the-evidence finding that Meuse uttered this statement with intent to obstruct the trial and gain an advantageous severance, <u>see</u> <u>United States</u> v. <u>Feldman</u>, 83 F.3d 9, 15 (1st Cir. 1996), whereas the Meuse claim depended entirely on his self-serving characterization of the relevant events. His counsel represented to the district court that Meuse had <u>not</u> requested that she inform the court that Meuse wanted to fire her, but only that he was unhappy with the Ferguson cross-examination and was considering whether or not to dismiss her. Given the equivocal account which Meuse gave of their conversation,[21] the district court, as factfinder, was entitled to credit counsel's version. The district court noted as well that earlier Thomas Meuse had used his attorney to pass notes to the court. Thus, John Meuse plainly was aware that there were other means of communicating with the court besides blurting out his concerns in open court.

Thus, the record amply supported the district court finding, by a preponderance of the evidence, that Meuse "calculated

---

[21]After the district court twice asked if Meuse had requested that his attorney so inform the court, Meuse could only respond: "I thought I made it clear."

34

[his outburst] to create the greatest damage to his trial," in hopes of obtaining a belated severance.

## L.   **The Restitution Order**

Finally, Todd Arsenault argues that the district court erred in ordering $70,000 in restitution, without first considering his ability to pay.  He claims a limited future-earning potential on the ground that he had reported income totaling only $1383 in the preceding ten-year period, has serious medical and emotional problems, and little education or vocational training.

We review restitution orders for abuse of discretion. See United States v. LiCausi, 167 F.3d 36, 52 (1st Cir. 1999). Sentencing courts need not make explicit factual findings on the five factors enumerated in 18 U.S.C. § 3664(a), including the defendant's ability to pay, United States v. Vaknin, 112 F.3d 579, 591 (1st Cir. 1997), provided the record supports any implicit finding.  In this case, the district court specifically stated that it had reviewed the presentence report, which included a detailed outline of Arsenault's financial prospects.  Significantly, it reflected that Arsenault would be relatively young when he completed his five-year prison sentence and would have the opportunity to work at his father's business.  Finally, Arsenault was ordered to repay a mere 20% of the losses sustained by his victims.  We discern no abuse of discretion in the restitutionary order.

35

## III

### CONCLUSION

Appellants' many other arguments having been carefully considered as well, and having been determined meritless, we affirm their respective convictions and sentences.

**Affirmed**.